**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **In re:** | ) | **Chapter 7** |
| **John J. Reilly and Anne H. Reilly,** | ) | **Case No. 23-11753** |
| **Debtors.** | ) | **Honorable Deborah L. Thorne** |
| **Steven Goldsher and Linda Goldsher,** | ) | **Adversary No. 24-00221** |
| **Plaintiffs,** | ) | |
| **v.** | ) | |
| **Richard Mason, Chapter 7 Trustee** | ) | |
| **Defendant.** | ) | |

## AMENDED MEMORANDUM OPINION

This matter comes before the court on a dispute over whether a pre-petition contract between a debtor and a creditor to transfer tax incremental financing (TIF) payments was a true assignment or a security interest that required perfecting. Creditors Steven and Linda Goldsher (the Goldshers) filed an Adversary Complaint asking the court to find that John Reilly (together with his wife Anne, the Debtors) assigned his interest in the TIF payments to cover an earlier loan from the Goldshers, and that the TIF payments are thus not part of the bankruptcy estate. Under the totality of the circumstances test set out in *In re Vorobil*, the court finds that the contract created a security interest that the Goldshers failed to perfect.

## BACKGROUND

The Debtors filed for chapter 7 bankruptcy on September 5, 2023. (Bankr. Pro., Dkt. 1). The Goldshers filed their Adversary Complaint on July 26, 2024, based on an agreement

between the Goldshers and Mr. Reilly that purported to assign Mr. Reilly's right to receive TIF payments to Mr. Goldsher. (Adv. Proc., Complaint, Dkt. 1). These payments stemmed from a December 2019 agreement in which Mittera Illinois, LLC (Mittera) agreed to pay Mr. Reilly regular TIF payments that Mittera was receiving from the Village of Berkeley, Illinois. (Joint Statement of Disputed and Undisputed Facts ¶ 12, Dkt. 26).

Mr. Reilly's debt to the Goldshers was long outstanding. In 2016 and 2017, he executed two promissory notes in favor of the Goldshers to repay unsecured loans of $500,000 and $200,000. (Plaintiffs' Proposed Findings of Fact and Conclusions of Law ¶¶ 2–3, Dkt. 36). Mr. Reilly defaulted on both notes. The Goldshers sued him in state court on July 18, 2019 to enforce the $200,000 note.[1] (Dkt. 26 ¶ 13).

In March 2020, the parties entered a settlement agreement for this case, but Mr. Reilly defaulted again and litigation continued. On July 16, 2020, the Goldshers filed a second suit, this time to enforce the $500,000 note.[2] (*Id.* ¶ 15). The Goldshers eventually secured judgments in both cases, for a total of nearly $800,000. (*Id.* ¶¶ 15–22; Trustee's Proposed Findings of Facts and Conclusions of Law ¶ 48, Dkt. 37).

Despite the judgments, the Goldshers continued having trouble collecting the debt. In early 2021, Mr. Reilly and Mr. Goldsher signed a contract titled "Assignment Agreement" (the Agreement), which purported to assign Mr. Reilly's interest in the TIF payments to Mr. Goldsher. (Dkt. 36 ¶ 28; Assignment Agreement ¶ 1, Ex. 2, Dkt. 6). The Goldshers did not file a financing statement under the Uniform Commercial Code (UCC), 810 ILCS 5/9-310(a). (Dkt. 36 ¶¶ 26, 36). Mittera has paid the Goldshers at least $200,000 under the Agreement, and

[1] *Goldsher v. Reilly*, No. 2019 L 007881 (Ill. Cir. Ct. July 18, 2019).
[2] *Goldsher v. Reilly*, No. 2020 L 007526 (Ill. Cir. Ct. July 16, 2020).

the parties believe that it is holding an additional $160,000 pending resolution of the adversary proceeding. (Dkt. 26 ¶¶ 24–25).

## DISCUSSION

The Trustee and the Goldshers dispute whether the Agreement was a true assignment or just a security interest disguised as one. If the Agreement is an absolute assignment, as the Goldshers argue, then Mr. Reilly gave up his ownership of the TIF payments in 2021, and they are not properly part of the bankruptcy estate. If the Agreement is not an absolute assignment, as the Trustee argues, then the Goldshers hold only an unperfected security interest and the Trustee can claw back the TIF payments under 11 U.S.C. § 551. For the reasons below, the court agrees with the Trustee that the Agreement created only a security interest that the Goldshers failed to perfect.

### I. Security Interests and Absolute Assignments

The line between a security interest and an assignment is often thin, and courts look at both the intent of the parties and the text of the agreement.

Under Illinois law, a security interest is "an interest in personal property or fixtures which secures payment or performance of an obligation." 810 ILCS 5/1-201(35). An assignment is the "transfer [of] some identifiable property right, interest or claim from the assignor to assignee." *Dep't of Transp. v. Heritage-Pullman Bank & Trust*, 627 N.E.2d 191, 192 (Ill. App. 1993). No particular language is required to create a valid assignment, and "any document which sufficiently evidences the intent of the assignor to vest ownership . . . in the assignee is sufficient." *Id.* While a security interest transfers an interest in ownership, an absolute assignment transfers the ownership itself, depriving the assignor of future

ownership interests in the transferred property. *Richardson v. Pana Limestone Quarry Co. (In re Leprechaun Trucking, Inc.)*, 356 B.R. 190, 196–97 (Bankr. C.D. Ill. 2007).

Any security interest must be perfected under the UCC, but "an assignment of a single account, payment intangible, or promissory note to an assignee in full or partial satisfaction of a preexisting indebtedness" is excluded from the perfection requirement. 810 ILCS 5/9-109(d)(7). The Goldshers contend that the Agreement falls under the § 9-109(d)(7) exception because it was intended to be an absolute assignment that transferred Mr. Reilly's rights to the Goldshers in full or partial satisfaction of his existing debt.

The Goldshers believed they were creating an absolute assignment, and the wording of the Agreement reflects this belief, but only to a point. Under the Agreement, Mr. Reilly "transfers, assigns and sets over to [Mr. Goldsher] all of [his] right, title and interest in and to any and all [TIF] payments . . . until such time as [Mr. Reilly's pre-existing debts] have been repaid in full." (Agreement ¶ 1, Dkt. 6-2). The Agreement provides that Mr. Reilly will be released from these obligations once both he and Mr. Goldsher "have directed Mittera in writing that all sums due to [the Goldshers] have been paid in full, or the judgment has been released." *Id.* ¶ 2. Mr. Reilly may not impair his interest in the TIF payments "[u]ntil the [debts] have been repaid in full." *Id.* ¶ 4(c). The use of "until" throughout the Agreement suggests that Mr. Reilly retained future rights to the TIF payments once his debt to the Goldshers was repaid. This is the case even if the parties later realized that the TIF payments would never be enough to cover the debt.

The Goldshers argue that the court should ignore the provisions that refer to Mr. Reilly's future interest in the TIF payments. In their proposed facts, they argue that they "consented to including what the Trustee calls a reversionary clause merely as an innocent

accommodation to placate [Mr. Reilly], who otherwise might have resisted signing the document." (Dkt. 36 ¶ 34). Indeed, the Goldshers pointed out that Mr. Reilly only "agreed to sign once that clause was in the agreement." (*Id.* (quoting Trans. Vol. 2 at 234:17–20)). Whether the future interest language was included to "placate" Mr. Reilly is largely irrelevant once it made its way into the Agreement. His refusal to sign the Agreement until the language was included indicates the importance he placed on retaining some rights in the TIF funds if he was able to pay off his debt, through the TIF payments or otherwise. The court cannot read out this key language, and to the extent it is ambiguous, the Agreement must be construed against the Goldshers as drafters. *See, e.g.*, *Stampley v. Altom Transp., Inc.*, 958 F.3d 580, 586 (7th Cir. 2020). Although the Agreement purported to be an assignment, its terms did not fully deprive Mr. Reilly of his ownership interest in the TIF payments.

## II. The *Vorobil* Test

Courts consider the totality of the circumstances when differentiating between an absolute assignment and a security interest. In *In re Voboril*, the Bankruptcy Court for the Eastern District of Wisconsin considered five factors:

> Generally, an assignment of accounts creates a security interest where: (1) the assignee retains a right to a deficiency on the debt; (2) the assignee acknowledges that his rights in the assigned property would be extinguished if the debt owed were to be paid through some other source; (3) the assignee must account to the assignor for any surplus received from the assignment over the amount of the debt; (4) the assignor's debt is not reduced on account of the assignment; or (5) the contract language itself expresses the intent that the assignment is only for security.

*Voboril v. First Bank Fin. Ctr. (In re Voboril)*, 568 B.R. 797, 799 (E.D. Wis. 2017).[3] The Goldshers acknowledge in their Complaint that these factors apply, yet their analysis focuses

[3] Although *Voboril* used Wisconsin law to analyze these factors, Illinois courts have adopted the approach in analogous situations. *Cf. Paloian v. LaSalle Bank Nat'l Ass'n (In re Drs. Hosp. of Hyde Park, Inc.)*, 507

only on the language of the Agreement. (Compl. ¶¶ 28–37, Dkt. 1). Applying these factors, the court finds that the Agreement created a security interest subject to the UCC. 810 ILCS 5/9-109(a).

**a. Plaintiffs have a right to a deficiency on the debt.**

The first factor of the *Voboril* test asks whether "the assignee retains a right to a deficiency on the debt." *Voboril*, 568 B.R. at 799. Here, although the Goldshers state that they "largely ceased their enforcement actions" against Mr. Reilly after executing the Agreement, the Agreement does not waive their right to a deficiency judgment. (Compl. ¶ 32, Dkt. 1). Instead, it expressly provides that the Agreement would terminate only once "all sums due to [the Goldshers] have been paid in full, *or the judgment has been released*." (Agreement ¶ 2, Dkt. 6-2 (emphasis added)). The Agreement does not give Mr. Reilly a way to secure release of the judgment, but rather conditions its completion on an external event that only the Goldshers or a court could control. The Goldshers go further by asserting that the Agreement was "beneficial" to Mr. Reilly because "he did not have to continue appearing in court in response to the Plaintiffs' enforcement actions," yet that result came only because of the Goldshers' voluntary action, not because of any provision in the Agreement. (Compl. ¶ 22, Dkt. 1). The Agreement's terms clearly preserve the Goldshers' right to a deficiency judgment, so this factor weighs in favor of a secured interest rather than an assignment.

**b. Plaintiffs' rights to the TIF payments would be extinguished if the debt were paid by some other source.**

The second factor of the *Voboril* test asks whether "the assignee acknowledges that his rights in the assigned property would be extinguished if the debt owed were to be paid

B.R. 558, 709–10 (applying similar factors to determine whether a transaction was properly a security interest or a "true sale" that removed property from the bankruptcy estate).

through some other source." *Voboril*, 568 B.R. at 799. The Goldshers acknowledged that the Agreement was intended to cover no more than the existing debt, with "language stating that if [Mr. Reilly] paid the [Goldshers] in full, any sums still owed by Mittera pursuant to the TIF Agreement would revert to [Mr. Reilly]." (Compl. ¶ 20, Dkt. 1). The language of the Agreement is even broader. It states that the Agreement will remain in "full force and effect" until "all sums due to [the Goldshers] *have been paid in full*, or the judgment has been released." (Agreement ¶ 2, Dkt. 6-2 (emphasis added)). Because any source that paid off the debt would extinguish the Goldshers' right to the TIF payments, this factor weighs in favor of a secured interest.

**c. Plaintiffs must account to the Debtor for any surplus received from the Agreement over the amount of the debt.**

The third factor of the *Voboril* test asks whether "the assignee must account to the assignor for any surplus received from the assignment over the amount of the debt." *Voboril*, 568 B.R. at 799. The Goldshers acknowledged that they could not receive payments under the Agreement beyond the amount of the debt because "neither party wanted the [Goldshers] to be overpaid and potentially subject to a fraudulent conveyance claim from [Mr. Reilly's] other creditors." (Compl. ¶ 20, Dkt. 1). The concern about overpayment again demonstrates that the Agreement was intended to secure the existing debt, rather than create an absolute assignment to reduce or satisfy the debt.

**d. It does not appear that the Debtor's debt was reduced on account of the Agreement.**

The fourth factor of the *Voboril* test asks if "the assignor's debt is . . . reduced on account of the assignment." *Voboril*, 568 B.R. at 799. Although the Goldshers state that Mr. Reilly "confirmed his intent that he was assigning his rights to the TIF Payments to Plaintiffs

to satisfy his obligations" to them when he signed the Agreement, the Agreement is expressly tied to the amount of the original debt. (Compl. ¶ 19, Dkt. 1; Agreement ¶¶ 2–3, Dkt. 6-2). It contains no indication that it reduced, much less satisfied, Mr. Reilly's debt, but instead redirected the TIF payments to the Goldshers, who voluntarily stopped their enforcement actions. Because the Agreement did not fully or partially satisfy Mr. Reilly's preexisting obligation, this factor weighs in favor of finding a security interest.

**e. The language of the Agreement expresses an intent that it is an assignment and not security.**

The final factor of the *Voboril* test asks whether "the contract language itself expresses the intent that the assignment is only for security." *Voboril*, 568 B.R. at 799. Here, the Agreement did not express that it was only for security; indeed, it did not even include the word "security." It is titled "Assignment Agreement," the parties are called "Assignor" and "Assignee," and it purports to "assign to [the Goldshers], all of [Mr. Reilly's] right, title and interest in and [TIF] payments to be received from Mittera." (Agreement at 2, Dkt. 6-2). It uses present language to state that once the Agreement is executed, Mr. Reilly "hereby transfers, assigns and sets over to [the Goldshers] all of [Mr. Reilly's] right, title and interest in and to any and all [TIF] payments due, or to become due." *Id.*

Yet contractual language may say one thing and do another. In *Voboril*, the agreement included language stating that it was an agreement for security. *Voboril*, 568 B.R. at 799–800. In contrast, *Stephenson v. First Union National Bank*, the case that *Voboril* cited for the factor test, held that an agreement that did not include language about security could nonetheless be interpreted as a security agreement: "[R]egardless of the terms of a written agreement a court sitting in equity may look to the practices, objectives, relationship, and the intention of the parties in determining the true meaning of a document." *Stephenson v. First Union Nat'l*

*Bank (In re Berry)*, 198 B.R. 82, 87 (Bankr. D.S.C. 1995) (quoting *In re Carolina Utils. Supply Co.*, 118 B.R. 412, 415 (Bankr. D.S.C. 1990)).

Here, each provision in the Agreement purporting to assign all rights contains an important caveat: the "assignment" will last only "until such time as the [earlier debts] have been repaid in full pursuant to the terms of the applicable agreements and/or judgment order." (Agreement ¶ 1, Dkt. 6-2). The TIF payment obligation is directly contingent on payment of Mr. Reilly's debt, and is reduced by the amount of the second judgment "[i]n the event a Court determines that [the judgment] is not due and owing."[4] *Id.* Moreover, unlike a true absolute assignment that divests the assignor of present and future rights in the assigned property, the Agreement contemplates Mr. Reilly's continued ownership of (and theoretical ability to further encumber) the TIF payments by providing that he "shall not pledge, promise, assign, transfer, convey or otherwise encumber any of his rights under the Agreement, or any interest therein" "*[u]ntil the Judgment and Indebtedness have been repaid in full*." *Id.* ¶ 4(c) (emphasis added).[5] Although the fifth factor weighs somewhat in favor of the Agreement being an assignment, it does not come close to outweighing the other four.

**CONCLUSION**

Because the Goldshers did not have the right to all of Mittera's TIF payments to Mr. Reilly if the judgment was repaid, and because perfection by filing a statement under the UCC was required, the Goldshers have a security interest in the TIF payments that they did not perfect. The Trustee has the rights of a typical lien creditor under 11 U.S.C. § 544(a), is

[4] The court finds it persuasive that any reduction in the debt was expressly contingent on an outside court finding, rather than on the Agreement itself.

[5] The Agreement also requires Mr. Reilly to "promptly notify [the Goldshers] in the event of any transfer of, or levy upon, [Mr. Reilly's] interest in the Agreement or . . . entitlement of payments from Mittera," further demonstrating that Mr. Reilly retains at least some right to the TIF payments. (Agreement ¶ 5, Dkt. 6-2).

entitled to avoid the unperfected security interest, and can preserve the TIF Payments for the benefit of the bankruptcy estate under § 551.

Dated: September 22, 2026

Honorable Deborah L. Thorne
United States Bankruptcy Judge